**Judith E. WINTERS, Plaintiff,**

v.

**PRUDENTIAL–BACHE SECURITIES, INC., Defendant.**

No. 84 C 5228.

United States District Court, N.D. Illinois, E.D.

Dec. 31, 1984.

Carrie E. Hewitt, Robert Burke, Chicago, Ill., for plaintiff.

N.A. Giambalvo, Brian E. Martin, of Boodell, Sears, Giambalvo & Crowley, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This employment discrimination action is before the court on the motion for full summary judgment of defendant Prudential-Bache Securities, Inc. Plaintiff Judith Winters has brought a three-count complaint charging defendant with sex and age discrimination in violation of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Equal Pay Act of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("EPA"), and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621, *et seq.* ("ADEA"). For the reasons stated below, the motion is granted in part and denied in part.

### Title VII

*1. Scope of the EEOC Charge*

Defendant argues that the Title VII allegations in Count I far exceed the scope of the EEOC charge filed in this case. Winters filed two charges before commencing the present action. The first contains a one-sentence description of the challenged incident. In it, Winters states, in part, that, "I believe I have been discriminated against ... in that I was denied a salary increase from May 1, 1983 until November 14, 1983 (when I resigned my position) by Terrence Brennan...." The second charge expands on the original allegation of salary discrimination, and adds that "[a]s a result of the discriminatory treatment I received I resigned my position on November 14, 1983."

The present complaint alleges both a constructive discharge and a discrimina-

754

tory denial of a salary increase. (While certain allegations appear to be attempting to state a sexual harassment claim, Winters explains in her responding memorandum that no such claim is being asserted.) The question before the court is whether the constructive discharge claim is sufficiently related to the EEOC charges to allow jurisdiction over it in this forum. Before examining this issue, the court notes that the constructive discharge claim rests not only on defendant's failure to award Winters a salary increase, which alone could not state a claim for constructive discharge, *Held v. Gulf Oil Co.,* 684 F.2d 427, 434 (6th Cir.1982), *see also Geisler v. Folsom,* 735 F.2d 991, 996 (6th Cir.1984), but also on defendant's alleged demeaning attitude towards Winters based on her age and sex.

In examining the proper scope of the allegations of a Title VII civil complaint, the courts have allowed plaintiffs to expand the scope of the EEOC charge, so long as the allegations are reasonably related to the charge. The Fifth Circuit articulated this rule in *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970), when it held that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." The Seventh Circuit accepted this standard of construing EEOC charges and civil complaints. *Jenkins v. Blue Cross Mutual Hospital Insurance, Inc.,* 538 F.2d 164, 167 (7th Cir.), *cert. denied,* 429 U.S. 986, 97 S.Ct. 506, 50 L.Ed.2d 598 (1976). In addition, the courts should be solicitous of plaintiffs who, while in district court are represented by counsel, completed the EEOC charge without legal aid. *See Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972).

Even construing broadly the two EEOC charges in this case, the court agrees with defendant that the constructive discharge allegations exceed the scope of Winters' filings with the EEOC. In neither is there a hint that she had any complaint other than the denial of a salary increase. There is simply no allegation of the other discriminatory treatment of which she now complains. Winters does state in both charges that she "resigned." And, in the second charge she states that the resignation was prompted by discriminatory treatment. However, in that charge the discriminatory treatment is described only as defendant's refusal to give her a salary increase. No other discrimination, such as the demeaning attitude of her supervisor, Terrence Brennan, is included to warn the EEOC that circumstances other than a salary dispute were responsible for the resignation. While there may be incidents of salary discrimination so outrageous as to rise to the level of constructive discharge, the allegations and evidence here fall squarely within the holding of *Held v. Gulf Oil Co., supra,* and alone cannot support a constructive discharge claim. The EEOC, therefore, would not have known to investigate any incident of Winters' employment besides that described in her two charges, namely, the single failure to obtain a salary increase. *Carillo v. Illinois Bell Telephone Co.,* 538 F.Supp. 793 (N.D.Ill.1982). Moreover, Winters does not present any evidence that would suggest the EEOC did investigate beyond this one discrete incident.

This conclusion does not require a complainant to use legal terms in the charge or to make an exhaustive list of discriminatory acts. However, neither can a complainant set forth one act of discrimination and thereafter file a complaint alleging others not even suggested by the charge. Apart from failing to notify the employer of the type of discrimination charged, such a system would vitiate the EEOC's attempts to resolve discrimination actions extra-judicially.

The court therefore finds that the allegations of the complaint regarding constructive discharge should be stricken. The court accepts Winters' claim that the complaint does not attempt to state a sexual harassment claim (this would be beyond the EEOC charge in any case). Hence, Count I may state a claim only for the

discriminatory denial of a salary increase. Of course, the allegations and evidence that Winters was treated in a demeaning way by her supervisor remain evidence in Winters' claim of discrimination, although they are not actionable in themselves.

### 2. Statute of Limitations

■ Defendant next argues that the claim of salary discrimination is time-barred. The court agrees with defendant that the salary discrimination in this case cannot be termed a "continuing violation." *See Stewart v. CPC International, Inc.,* 679 F.2d 117, 120–21 (7th Cir.1982). The continuing violation cases cited by Winters, concerning unlawful salary differentials between women and men, are not on point. While Winters alleges such salary discrimination in her EPA count, it is certainly not alleged in Count I or the EEOC charge. Rather, as the allegations of this disparate treatment case clearly illustrate, Winters claims she was discriminatorily denied a salary increase at one point in time. Her Title VII allegations register no other complaint regarding her salary than this one event.

■ As a continuing violation theory is not applicable to this case, the court must determine the date on which defendant denied Winters a raise. This is the appropriate date from which to measure the period, as the limitations period "normally commence[s] when the employer's decision is made." *Delaware State College v. Ricks,* 449 U.S. 250, 261, 101 S.Ct. 498, 505, 66 L.Ed.2d 431 (1980). The period may be tolled to the date on which the "facts that would support a charge of discrimination under Title VII were apparent or should have been apparent to a person with a reasonably prudent regard for his rights similarly situated to plaintiff." *Wolfolk v. Rivera,* 729 F.2d 1114, 1117 (7th Cir.1984) (quoted in *Janowiak v. The Corporate City of South Bend,* 750 F.2d 557 at 560 (7th Cir.1984).

In this case, the date of the discriminatory act is unclear. It is undisputed that defendant's practice concerning salary in-creases was to review the employee's performance annually on the date of the last promotion, which in Winters'- case was in May. (Brennan Aff. ¶¶ 4–5.) Her last salary increase was in May 1982. (*Id.* at ¶ 5.)

In support of defendant's claim that the denial occurred in May 1983, Brennan states that he had several discussions with Winters concerning poor job performance in late 1982. (Brennan Aff. ¶ 13.) Winters does not deny this, although she claims that the contents of any specific complaint about her by co-workers were never brought to her attention. (Winters Aff. ¶ 14.) On March 24, 1983, Brennan wrote a memo to Winters complaining of recent incidents of misconduct, warning that they could be the basis for a dismissal. (Brennan Aff. ¶ 13 & Exhibit A.) Winters agrees she received such a memo, but denies some of the facts recited therein. (Winters Aff. ¶¶ 32–33.)

In May 1983, Brennan claims that he discussed Winters' conduct and attitude problems with her, indicating that he "was not going to recommend a salary increase because her performance did not warrant it." (Brennan Aff. ¶ 14.) He also claims that he reviewed her performance as he would that of any other employee. Winters agrees that she had discussions with Brennan concerning her salary starting in May, but makes clear that no firm decision was made at that time. She explains:

> My work and salary performance reviews were regularly conducted in late-April or early-May. Following my reviews, I always received a pay raise.
>
> \*    \*    \*    \*    \*    \*
>
> When Mr. Brennan failed to arrange my evaluation in 1983, I spoke with him on or about May 19, 1983 about my annual salary increase. He put me off, and I had to raise the matter with him on several subsequent occasions during the months of June, July, September and November 1983. I was never given a pay raise or a performance review during this period.

(Winters Aff. ¶¶ 11–12; *see* EEOC Charges filed December 13, 1983 and January 6, 1984.) According to Brennan, Winters again requested a salary increase in late June 1983. On July 15, 1983, Brennan sent Winters a memo in which he states "there will not be a raise." (*Id.* at ¶ 15 & Exhibit B.)

There is a substantial amount of evidence supporting defendant's claim that Winters knew in May 1983 that she might not receive a raise. Brennan claims that he told her he would not recommend she receive a raise. Winters does not deny this claim, although she does testify that Brennan kept her in the dark concerning her salary. Moreover, Winters agrees that Brennan was responsible for her reviews. (Winters Aff. ¶ 11.) If the denial took place any time in May, the present charges would have been filed more than 180 days after the discriminatory event.

Still, the evidence on this crucial point of time is not clear. First, while Brennan clearly had the power to recommend a salary increase, there is no evidence explaining the scope of his authority over this decision. If the decision was totally within his control or if his recommendations were always followed, the May 1983 conversation concerning his recommendation, if it in fact took place as Brennan relates, would be strong evidence that the denial occurred in that month. However, Brennan's own Exhibit B suggests that such was not his authority. For example, he explains to Winters in that July 15, 1984 memo that, "In answer to your question, of a few weeks ago, regarding a raise, I see no reason for it. After consultation with my New York counter-parts, it has been decided that there will not be a raise." This memo suggests that his May 1983 statement was not the last word on Winters' raise. In addition, while Brennan describes this memo as a "reaffirmation" of some earlier denial, in fact it contains no indication that he had previously denied her a raise. These facts and omissions, coupled with Winters' testimony that no review took place in May or later in 1983, obscure the actual date of the denial. Winters'

affidavit establishes that Brennan "put her off" about whether she would receive a raise, suggesting not that she was denied a raise from May to July but that she did not know whether she was going to get one.

■ The present facts suggest that Winters was kept in the dark over the status of her raise, and that the raise may not have been rejected until sometime in June or July. Since a June or July denial could result in a timely filing in this case, the court cannot resolve the disputed facts before it. Hence, the motion for summary judgment on the Title VII claim as time-barred is denied at the present time.

### 3. Merits of the Title VII Claim

■ Defendant next contends that summary judgment on the substantive issues in the Title VII count is appropriate. The court disagrees. It is true that the affidavits submitted by defendant support a nondiscriminatory reason for the denial of a salary increase. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1972). However, Winters' affidavits are sufficient to create a dispute of fact over whether this articulated reason was a mere pretext for unlawful discrimination. Contrary to defendant's representations, Winters' affidavit does not simply contain an assertion that she was discriminated against. *See Lim v. Citizens Savings and Loan Association*, 430 F.Supp. 802, 814 (N.D.Cal.1976) (plaintiff opposes employer's affidavits by stating only, "I believe I was discriminatorily treated"). Rather, it includes her observations that Brennan favored male supervisors and treated her, the only female supervisor, in a demeaning way. Further, the change in her evaluations before and after Brennan became her supervisor is dramatic. This evidence may suggest merely that the two did not get along. However, the evidence may be interpreted as going further, and indicating that the motivating reason for the animosity was Brennan's discriminatory attitude towards Winters as a woman employee with super-

visory responsibilities, and that this animosity extended to his evaluation and refusal to recommend a raise. These issues of motive and intent are clearly presented by the Winters affidavit, and are not appropriate for resolution on this motion. Summary judgment is therefore denied.

### 4. Punitive and Compensatory Damages

■ Winters requests damages for emotional and physical pain and suffering engendered by the Title VII violation. The court follows the weight of authority in this district that such damages are not available under Title VII. *Seidel v. Chicago Savings and Loan Association*, 544 F.Supp. 508, 510 (N.D.Ill.1982); *Goodman v. Board of Trustees of Community College District 524*, 498 F.Supp. 1329, 1334 (N.D.Ill.1980); *Plummer v. Chicago Plumber's Local 130*, 452 F.Supp. 1127, 1141 (N.D.Ill.1978), *rev'd on other grounds*, 657 F.2d 890 (7th Cir.1981). The motion to strike the prayer for compensatory and punitive damages in Count I is therefore granted in full.

### Equal Pay Act

■ Summary judgment on the EPA claim is granted. In her EPA claim, Winters compares her job with that of John Hill. Under the EPA, the complainant must compare her salary with the salary obtained by a male in a job "substantially equal" to her own. *Schultz v. Wheaton Glass Co.*, 421 F.2d 259 (3d Cir.), *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970). To demonstrate substantial equality, the complainant must show that her lower-paid job actually entailed equal skill, effort, and responsibility, and was performed under similar working conditions. 29 C.F.R. § 800.125.

Defendant submits Hill's affidavit as the primary evidence that his and Winters' jobs differed. Hill was the Administrative Assistant to Brennan in the Chicago office's Sales Department. As such, he had supervisory authority over sales aids and wire room operators, including Winters. (Hill Aff. ¶ 2.) (Winters disputes that Hill supervised her, Winters Aff. ¶ 18, but this is not relevant to the court's determination.) Seventy-five percent of Hill's time is spent making certain that deliveries to defendant's customers are "effected in the proper manner," a job that requires extensive client contact. (Hill Aff. ¶ 3.) About ten to fifteen percent of his time is spent in bookkeeping activities concerning delivery accounts. (*Id.*) Hill concludes that

> The balance of my job duties involve [sic] supervision of sales aids and wire room employees; supervision of the processing of orders in the wire room, making certain office equipment and supplies are maintained, supervising maintenance and storage of office records, and in general, making certain that the office operates efficiently.

(Hill Aff. ¶ 3.) Hill spends no significant time operating the teletype machines and, in fact, was not even trained to operate one until he decided this knowledge would be helpful in emergency situations. (*Id.* at ¶ 4.) Hill also took over cashiering and monitoring daily business from Winters when he was transferred to the Sales Department, allegedly because it was handled incompetently by Winters. (*Id.* at ¶ 5.) According to Hill, he spends about twenty percent of his time, and Winters now spends about five percent of her time, doing this work. He claims that Winters has no client contact. (*Id.*)

Brennan describes Winters' job as follows:

> Basically, Ms. Winters' job was to transmit and receive orders and confirmations, et cetera, to and from New York. In this capacity, she had supervision over an assistant wire room operator, but no other employees in the Sales Department. The bulk of the transmissions placed by Ms. Winters came from the Sales Department, although other departments such as the Municipal Bond Department would send orders to Ms. Winters in the wire room for transmission to New York.

(Brennan Aff. ¶ 6.) Winters has little or no client contact. (*Id.* at ¶ 8.) Hill, on the other hand, supervises all wire room and

sales aid employees, reports to Brennan concerning hiring, discipline, and evaluation, and only infrequently operates the teletype machine. (*Id.* at ¶ 9.)

This evidence clearly establishes the substantial differences in the two jobs. Winters' burden on this motion, therefore, is to demonstrate that these job descriptions are inaccurate, and that in fact the two jobs are equal. According to Winters, her job required supervising and training assistant teletype or wire operators working under her direction. (Winters Aff. ¶ 4.) Hill clearly does not conduct such training. In addition, Winters agrees that she had "limited customer contacts." She does explain that with Hill, she carried out bookkeeping functions, although her affidavit is consistent with Hill's assertion that he took over the bulk of these tasks. (*Id.* at ¶¶ 4, 35.) Winters would also "wire orders" and check delivery versus payment accounts to determine if securities were properly delivered and received. (*Id.* at ¶ 5.) Errors required contacting the salesperson involved. (*Id.*) About "half" of Winters' time was spent "in performing operational business duties, including monitoring the bookkeeping of pay on settlement accounts." (*Id.* at ¶ 6.)

Accepting all of Winters' statements concerning her job as true, they do not demonstrate that her and Hill's jobs were equal under the EPA. Hill supervised sales assistants. Moreover, his supervisory authority over the wire employees was different in kind from Winters', which required training. Winters operated the teletype machines as part of her job, however, Hill did so only as an emergency gesture, and was not required to know how to work the machines. Most of Hill's work required client contacts, and Winters admits that she had few such contacts. Furthermore, Winters' description of her own job is confusing. She uses such terms as "operational business duties" to describe what comprised half of her time. In contrast, Hill's description is detailed, and clearly illustrates at least that the jobs were not equal in responsibility and skill, and perhaps not in working conditions. The motion for summary judgment on the EPA claim is granted.

## Age Discrimination

Defendant's motion for summary judgment on this count is granted. Defendants have shown a nondiscriminatory reason for the denial of the salary increase. Unlike in the Title VII case, Winters has not presented a single piece of evidence tending to show that these reasons were a pretext for age discrimination. She once states in an affidavit that younger employees received salary increases, but there is no supporting evidence and no evidence tending to suggest that she is competent to testify to this fact.

Winters' burden is to meet defendant's evidence and demonstrate that facts exist justifying a trial. The court's briefing schedule was liberal, allowing Winters plenty of time to marshall such evidence if it existed. Moreover, Rule 56 allows one defending against a motion for summary judgment to request additional time in which to gather evidence. Even with these liberal policies, however, evidence on the ADEA claim is totally lacking. The motion is therefore granted on the ADEA count.

## Conclusion

The constructive discharge claim and prayers for punitive and compensatory damages in Count I are stricken. Summary judgment is denied regarding the Title VII claim in Count I. Summary judgment is granted as to the EPA and ADEA claims in Counts II and III.

It is so ordered.